FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

00 FEB 25  PM 4: 59

U.S. DISTRICT COURT,
N.D. OF ALABAMA

EBSCO INDUSTRIES, INC.,
et al.,

      PLAINTIFFS,

v.

      CASE NO.: CV-98-J-2825-S

LMN ENTERPRISES, INC.,
et al.,

      DEFENDANT.

**ENTERED**

**FEB 2 5 2000**

## MEMORANDUM OPINION

Currently before the Court are cross-motions for summary judgment as to the claims asserted by plaintiffs and the counterclaims asserted by defendant (docs. 54 and 56). This court heard oral argument on the motions and has reviewed the memoranda of law and evidence submitted by the parties. The facts before this court are as follows:

The plaintiff alleges in its thirty-eight count amended complaint ("amended complaint") that the defendants have committed various acts of trademark infringement, unfair competition, dilution of word and configuration trademarks and false advertising. Amended Complaint at ¶ 4. Both the plaintiff and the defendants are in the business of producing fishing lures. The claims of the plaintiff are as follows:

> **Counts I, VIII, XIII, XVIII, XX, XXXIV:  Trademark Infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114(1)** -- Jitterbug configuration; Hula Popper configuration; Deep Teeny Wee Crawfish configuration, Zara Spook configuration; Spine design.

**Counts II, IX, XIV, XIX, XXV, XXIX, XXXI: Unfair Competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)** -- Jitterbug configuration; Hula Popper Configuration; Deep Teeny Wee Crawfish configuration, Spook word and configuration, Torpedo configuration, Devil's Horse configuration, Th Spot configuration

**Counts III, X, XV, XXI, XXVIII, XXX, XXXII:   Common Law Trademark Infringement, Trade Dress Infringement and Unfair Competition** -- Jitterbug configuration; Hula Popper Configuration, Deep Teeny Wee Crawfish configuration,   Spook configuration, Torpedo configuration, Devil's Horse configuration,  Th Spot configuration

**Counts IV, XXVIIIa[1] : Federal Trademark Infringement of the Mark, 15 U.S.C. § 1114(1)** – Jitterbug mark, Torpedo mark

**Counts V, XI, XVI, XXII, XXIII, XXVI: Dilution of a Trademark under § 43(c), 15 U.S.C. § 1125(c);** Jitterbug configuration; Hula Popper Configuration; Deep Teeny Wee Crawfish configuration, Spook and Zara Spook word and configuration, Torpedo word and configuration

**Counts VI, XII, XVII, XXIV, XXVII, XXXa[2], XXXIII: Dilution under Alabama Code § 8-12-17** -- Jitterbug Configuration, Hula Popper Configuration, Deep Teeny Wee Crawfish configuration, Spook word and configuration, Torpedo word and configuration, Devil's Horse configuration; Th Spot configuration

**Count VII: Common Law Trademark and Trade Dress Infringement and Unfair Competition** -- Jitterbug Configuration

**Count XXXV: False Advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1114(1)**

---

[1]The plaintiff's amended complaint lists two counts both as number "XXVIII". For the sake of clarity, the court will refer to the second "XXVIII" (a claim for federal trademark infringement of the mark for the "Torpedo" lure), as XXVIIIa.

[2]The plaintiff's amended complaint lists two counts both as number "XXX". For the sake of clarity, the court will refer to the second "XXX" (a claim for dilution under Alabama law), as "XXXa".

### Count XXXVI: False Advertising under Alabama Code § 8-19-5

The plaintiff's motion for partial summary judgment seeks a finding that the defendants have infringed nine of plaintiff's federally registered trademarks (five configuration trademarks and four word trademarks). Plaintiff's memorandum of law in support of plaintiff's motion for partial summary judgment ("plaintiff's memo.") at 1. The defendants motion for summary judgment requests judgment in favor of the defendants and against the plaintiff on all counts of the plaintiff's Amended Complaint. Further, the defendants move for summary judgment on the defendants' fourth and fifth counterclaims. The defendants raise several affirmative defenses, including laches. Defendants' Answer to First Amended Complaint and Fifth Counterclaim at ¶ 269.

### I. FACTUAL BACKGROUND

The plaintiff owns Plastics Research and Development Corporation ("PRADCO"), a division of plaintiff which manufactures and sells fishing lures. The plaintiff manufactures lures under the name brands Rebel, Heddon, Bomber, Cotton Cordell, Smithwick, Excalibur, and Arbogast.[3] Plaintiff's memo. at 1. The defendants, LMN Enterprises, Inc. ("LMN") and Laura and Michael Lummis, bought the assets of their predecessor, PTC, which bankrupted, and incorporated as LMN in 1991. Pretrial Order uncontested fact numbers 14, 15, 16,

---

[3]The plaintiff purchased Smithwick Lures, Inc., in 1992. The Devil's Horse lure is sold under this brand name. Uncontested fact number 25. The plaintiff purchased certain assets of Arbogast in 1997, including the trademark rights to the Hula Popper and Jitterbug lures. The plaintiff has sold these lures under the Arbogast brand name ever since. Uncontested fact number 26.

17("uncontested fact number ___"); declaration of M. Lummis at ¶ 2, submitted as

defendant's opposition exhibit 20; plaintiff's exhibits in support 63-67. PTC sold some of

the lures at issue in this litigation as early as the mid 1980's. Defendants' brief in support

of their motion for summary judgment ("defendants' brief") at 1, plaintiff's exhibits 43, 45,

46, 48, 50, 51; uncontested fact numbers 7, 8, 9, 10; declaration of M. Lummis at ¶ 2. The

defendants manufacture lures under the name "the Producers." Defendants' brief at 1. The

defendants' fishing lure business is that of "look-a-likes" or "knock-offs" of more expensive

brands. Plaintiff's exhibits 43, 46. After becoming LMN, defendants continued to sell the

lures at issue. The shapes of the Ghost, Turbo, Crawdaddy, Zero and Double Ender lures

sold by PTC as early as 1987 are the same lure shapes LMN continues to sell today. Pretrial

order uncontested fact number 19. The plaintiff began selling the Super Spook lure in 1996.

The defendants began selling its Mega Ghost lure, the alleged Super Spook look-a-like, in

1998. Uncontested fact number 30.

The plaintiff owns federally registered trademarks for most of the shapes and names

of the lures at issue in this case.[4] The plaintiff claims to have rights in the remaining shapes

and names by virtue of its use of these names and the recognition by the public of these

---

[4]Plaintiffs own the following trademarks: For configurations: Hula Popper -- Reg. No. 1,508,373, registered Oct. 11, 1988 (defendant appendix exhibit 4); Jitterbug – Reg. No. 1,508,372, registered Oct. 11, 1988 (defendant appendix exhibit 5); Torpedo – Reg. No. 2,241,346 (supplemental register), registered April 20, 1999 (defendant appendix exhibit 6); Zara Spook – Reg. No. 2,145,552, registered Mar. 24, 1998 (plaintiff's exhibit in support 16); Crawdad -- Reg. No., 1,601,036, registered June 12, 1990 (plaintiff's exhibit in support 20).
For word marks: No. 502, 646 for "Spook", registered Oct. 5, 1948 (plaintiff's exhibit in support 21); No. 414, 660 for "Hula Popper"; No. 408,208 for "Jitterbug"; No. 389. 058 for "Torpedo".

shapes and names as an indication of the source of the products. The plaintiff also claims that the defendants sale of the defendants' lures dilutes the distinctive character of the plaintiff's marks in violation of federal and state law. The plaintiff claims further that the defendants falsely advertise their lures by alleging these lures were designed and endorsed by a champion professional fisherman, Tyrone "Boomer" Wells.

Defendants deny that the shapes and names of the defendants' lures violate any rights the plaintiff may have. The defendants deny their lures dilute the distinctive nature of the plaintiff's marks and further deny that any of the statements made in connection with the Boomer Wells character constitute false advertising. Defendants assert that the configurations, or shapes, of the lures of the plaintiff are functional and therefore not subject to trademark or trade dress protection. Defendants' counter-claim asserts that the defendant is the common law owner of the trademark "Ghost" for fishing lures and that plaintiff's sale of a "Ghost Minnow" violates defendants' rights. The defendants also claim that the plaintiff has breached a settlement agreement related to the Hawg Stopper and Chug-A-Lug fishing lures.

The plaintiff alleges that the defendants' Chug-A-Lug lure is similar to the plaintiff's Jitterbug lure, for which the plaintiff has a configuration trademark. Amended Complaint at ¶¶ 15, 21. The plaintiff further alleges it first sold the Jitterbug lure in 1938. Amended Complaint at ¶ 28. Additionally, the plaintiff claims the terms "Jitterbug" and "Chug-A-Lug" sound so alike that, when used on a similarly styled lure, the terms are likely to cause

confusion, mistake or to deceive. Amended Complaint at ¶ 37. The plaintiff states that the defendants' sale of the Chug-A-Lug lure dilutes the distinctive quality of plaintiff's mark and configuration. Amended Complaint at ¶ 42.

The plaintiff makes similar allegations as to its Hula Popper lure, which it claims is copied by defendants' Hawg Stopper lure; its Torpedo lure, copied by defendants' Turbo lure; and its Spook and Super Spook lures, copied by defendants' Ghost and Mega Ghost lures. Further, the plaintiff similarly alleges that its Deep Teeny Wee Crawfish lure is being copied by defendants' Crawdaddy lure.

The defendants assert the defenses of laches and/or acquiescence, which the plaintiff denies.

## II. STANDARD FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 47 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ...

6

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322.

### III. LEGAL ANALYSIS

The plaintiff argues that its marks have priority over defendants' marks and that defendants' marks are likely to cause confusion. The defendants argue that the plaintiff's configuration trademarks are *de jure* functional and therefore not entitled to trademark or trade dress protection. The defendants also argue that the plaintiff cannot show any likelihood of confusion, that the plaintiff's delay in filing suit bars its infringement, dilution, unfair competition and false advertising claims on the ground of laches. The defendants assert that the plaintiff's claims under the Federal Dilution Trademark Act are barred because the Act does not apply to conduct occurring before January 16, 1996. Defendant's pretrial order position statement number 6.

### A. Laches

The defendants argue that the plaintiff's claims are barred by laches because the plaintiff knew at least by 1989 that the lures in question were being copied and sold by defendants. *See* defendant opposition exhibit 46 (letter to PTC from plaintiff's counsel stating "On behalf of my clients, I demand an immediate cessation of your slavish copying

7

of these lures and the use of various trademarks of the parties"). The defendants' predecessor, PTC (of which defendant Michael Lummis was president) sold the Ghost lure as a copy of plaintiff's Zara Spook lure as early as 1987.[5] Plaintiff's exhibits 42, 43, 45, 46, uncontested fact number 10, defendants' appendix of evidentiary materials in support of their motion for summary judgment exhibit 17 ("defendant's appendix exhibit __") (doc. 57). The plaintiff alleges that its five configuration marks and four word marks were in use long before this time. *See* plaintiff's memo. at 10. The plaintiff argues, on this basis, that its marks have priority. The defendant does not allege otherwise. However, the plaintiff further argues that because it applied for trademark registration of these nine marks in 1991 and received the registration in 1998 and 1999, the plaintiff is not barred by laches. The defendant responds that the plaintiff could have sought to stop the defendants' use of the look-a-like lures long before the trademark registrations issued.

The parties agree that in 1989, PRADCO notified PTC of its alleged infringement activities. Uncontested fact number 12. Further, also in 1989, Arbogast (since purchased by plaintiff), complained to PTC of counterfeiting of Arbogast's Hula Popper and Jitterbug lures. Arbogast and PTC entered into a settlement agreement wherein PTC agreed to make changes to its lures. Uncontested fact number 13; defendant exhibit 31 to appendix of exhibits in opposition to plaintiffs' motion for partial summary judgment ("defendant opposition exhibit __"). The parties agree that LMN modified the Hawg Stopper and Chug-

---

[5]*See* plaintiff's exhibit in support 36, PTC Buy-Sell Agreement.

8

A-Lug lures in 1991 and have since sold these two lures in their modified configurations. Undisputed fact number 20.

Laches may bar claims under the Lanham Act for trade dress or trademark infringement. *Kason Indus. v. Component Hardware*, 120 F.3d 1199, 1203 (11th Cir. 1997), citing *Conagra Inc. v. Singleton*, 743, F.2d 1508, 1517 (11th Cir.1984). To succeed on their allegation that this action is barred by laches, the defendants must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable and; (3) there was undue prejudice to the party against whom the claim is asserted. *Kason*, 120 F.3d at 1203, citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir.1986). *See also Environmental Defense Fund v. Alexander*, 614 F.2d 474, 478 (5th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). In addition to considering whether the doctrine of laches estops the plaintiff from asserting its rights, the court must consider the public's interest in the trademark as a definite designation of a single source of the goods. *Conagra*, 743 F.2d at 1517.

The plaintiff argues that it had no protectible interest until 1998 and therefore, it is not barred by laches. Clearly, this is untrue. At least the names of the lures were entitled to protection under § 43(a), if the plaintiff could show that the word trademarks, whether registered or not, were "so associated with its goods that the use of the same or similar marks by another company constitute[d] a false representation that the goods came from the same source." *Conagra v. Singleton*, 743 F.2d 1508, 1512-1513 (11th Cir.1984); citing *Boston*

9

*Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.* 510 F.2d 1004, 1010 (5th Cir.1975) (quoting *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2nd Cir. 1956)), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Hence, even if this court found the defendants' use of lure names which alliterate or rhyme with plaintiff's lure names were so confusingly similar as to constitute a false representation, the court finds the plaintiff's protectible interest in these lure names arose substantially before 1998 when the lures themselves received federal registration.[6]   These two events are simply not interdependent.

Furthermore, the question under *Kason* is when the plaintiff had knowledge of the defendants' infringing activity, not when the plaintiff received its federal registration for the trademark in question. *Kason*, 120 F.3d at 1205 ("delay is to be measured from the time at which the plaintiff knows or should know [it] has a provable claim for infringement"). The plaintiff argues that the defendants' "willful continual activity is a complete bar to the laches argument." Hearing Transcript at 26. However, the court can find no support for this contention.[7]

---

[6]The court notes that several of the lures received federal trademark registration substantially before 1998.

[7]Clearly, intentional infringement may bar a laches defense with respect to injunctive relief. *See e.g. Kason,* 120 F.3d at 1207 ("laches will not bar an injunction against an intentional infringer.... if the likelihood of confusion is so inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, a court may in its discretion grant injunctive relief, even in cases where as suit for damages is barred").

The evidence in this case establishes that the plaintiff wrote PTC, defendants' predecessor, in 1989, stating that the defendants were copying the plaintiff's lures. Defendant appendix exhibit 18. *See also* defendant appendix exhibit 19 at question and response number 4; plaintiff's exhibits in support 54, 55, 56 and 59. The plaintiff argues that, even though the time under *Kason* is measured from when the plaintiff knew or should have known it had a probable infringement claim, this would not have been 1989 because PTC was in bankruptcy in 1990 and thus had no assets. Therefore, plaintiff concludes, no reason to sue defendant existed at that time. However, even if the court was to accept this argument, clearly by 1991 the plaintiff had knowledge of all the facts it needed to assess whether the defendants' lures raised infringement issues.[8]

The more substantial argument plaintiff makes is that, when plaintiff first applied for registered trademark protection, the trademark office proceeded with the process, but then decided that all fishing lures were *de jure* functional and hence could not be registered. *See e.g. In re EBSCO Industries*, 41 USPQ29 1917 (TTAB 1997). The plaintiff states it therefore had no reason to bring suit until 1998 when it received its registrations. Hearing transcript at 32-33. However, the court finds that the plaintiff could have brought suit alleging the

---

[8]The plaintiff makes the argument several times that the defendants were not worth suing earlier than 1998 based on the financial condition of the company. The court finds no authority for the suggestion that suit does not have to be brought against low asset companies with questionably infringing lures until the company starts making larger profits. *See e.g.*, Hearing Transcript at 34 (".... 1998 when Mr. Hall, who had been looking around trying to see what they were doing, found their sales level, according to the Dunn and Bradstreet Reports that they supply information to, went from three hundred thousand reported sales in 1991 to all of a sudden jump to a million sales in 1989").

defendants were copying its designs and lure names, engaging in unfair competition and diluting its marks without registered trademark protection.[9]

The plaintiff argues that, while it knew of defendants' infringement, it had no injury until it purchased Arbogast in 1997 and received trademark protection for the lures in 1998. Under *Kason, supra,* the test for when laches may apply is from when the plaintiff has knowledge of a claim or right, not from the date damages are evident. Plaintiff should not receive a windfall benefit from the purchase of Arbogast when Arbogast clearly had knowledge of the defendants alleged infringement activity since 1989. Furthermore, the court notes that the Arbogast label only produces a few of the lures at issue here. Plaintiff's exhibits in support 58, 59. The plaintiff through PRADCO wrote to PTC in 1989 concerning the Torpedo, Spook and Crawfish lures, as well as several others. Plaintiff's exhibit in support 57.

The defendants argue that the plaintiff's delay was inexcusable. At the very latest, the plaintiff knew no later than 1991 that the defendants were making look-a-like lures. In fact, the plaintiff wrote to the defendants in 1991 and 1992 asking that the defendants cease producing the very lures in question here. Defendants' appendix exhibits 19-22. The defendants also argue that actual prejudice has resulted from the plaintiff's delay, in that if

---

[9]To accept the plaintiff's argument, the court would, at a minimum have to rule that the plaintiff had no protectible interest until 1998. This would, of course, bar all of plaintiff's claims prior to 1998 and also create an even stronger laches argument for defendants. However, registration of the mark is not what the law requires before a trademark infringement suit may be brought.

PTC had been sued in 1989, defendants would not have purchased the remnants of PTC.[10]

The Court in *Kason* stated that a court should consider, in assessing laches, progressive encroachment and the likelihood of confusion at the time the plaintiff sued. *Kason*, 120 F.3d at 1206. Evidence submitted establishes that the defendants' sales have grown each year, however neither party alleges where its lures are sold. While the plaintiff gives the impression its lures are sold nationally, no evidence was submitted in support of this. Similarly, from the evidence, the court finds an inference that the defendants' lures are sold nationally, but to a much smaller market. *See e.g.* Hearing Transcript at 53 ("the defendant is selling in Michigan, Ohio and Indiana, but no longer in Fort Smith"); plaintiff's exhibit in support 37. The defendant also points out that its lures are sold solely out of "dump bins" or "lure riots" which are stand alone displays of just its lures. *See e.g* defendant appendix exhibit 18; declaration of Carter at 2; defendants' opposition exhibit 25. This would lessen any possibility of confusion even further, especially in conjunction with the vast differences in packaging.

However, because this court finds that genuine issues of material fact remain, especially concerning the issue of likelihood of confusion, given the similarity of the lures but the great variations in the packaging, the court finds summary judgment on the defendants' laches defense on the plaintiff's claims to be inappropriate.

---

[10]The court finds this assertion questionable as the evidence in this case demonstrates that the defendant Michael Lummis purchased the assets of his own bankrupt company in 1991.

### The Deep Teeny Wee Crawfish/Crawdaddy lures

The plaintiff received registered trademark protection of the crawfish configuration on June 12, 1990. Defendants' appendix exhibit 3. On October 2, 1991, counsel for plaintiff wrote to counsel for defendant and stated, "It has come to our attention that PTC, Inc. is selling a fishing lure which appears to be confusingly similar to, if not identical to, the "DEEP TEENY CRAW" fishing lure manufactured by [PRADCO] of Fort Smith, Arkansas.... On behalf of our client, we demand an immediate cessation of further manufacture and sale of the "CRAWDADDY" fishing lure by PTC., Inc., or Tyrone "Boomer" Wells. Defendant's appendix exhibit 20 (doc. 57). Counsel for defendants responded:

> As a point of information, PTC, Inc. no longer exists; however some of the lures originated by PTC, Inc. are presently being sold by LMN Enterprises, Inc... The CRAWDADDY™ lure offered for sale by LMN Enterprises, Inc. is but a simulation of a natural crawfish and thus functional. A specimen thereof is enclosed for your review.
>
> Inasmuch as the CRAWDADDY™ lure is constituted by functional configuration elements only, infringement of your client's trademark, U.S. Reg. No. 1,601,036 for fishing lures, is not deemed to have taken place....
>
> I trust that the foregoing will allay your client's concerns about alleged copying of its lures. As you can see, the CRAWDADDY™ lure is not a copy of your client's lure, nor does it encroach upon any valid trademark rights that your client may have.

Defendants' appendix exhibit 21 (doc. 57). This court finds that the plaintiff had all the knowledge it could possibly need to file suit against the defendant concerning the issue of

14

crawfish lure copying in 1991. The plaintiff admitted at oral argument that it could have brought suit over the crawfish configuration much earlier than it did. Hearing transcript at 33.

Not only was the plaintiff aware in 1991 that the defendants were producing a look-a-like lure, but it had even been informed by defendants that they had no intention of stopping production of their lure. As such, this court finds that the plaintiff's seven year delay in filing an infringement action over this lure is prejudicial to the defendants and unjustified.[11] This court finds plaintiff's argument that the defendant had no assets to recover if sued until 1998 not sufficient to excuse the plaintiff's delay. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999); citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 498 (2nd Cir.1961) ("[I]t cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of his right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished"). Even if the court accepted the plaintiff's argument that the defendant was not worth suing in 1990, the plaintiff had from 1991 forward to take action. In reliance on the plaintiff's lack of action, the defendant has continued to allocate resources, time and energy into the manufacture of these lures.

---

[11]The delay is actually much longer than seven years, but the court must examine the defendants' motion for summary judgment in the light most favorable to plaintiff. The plaintiff represented to this court that "we have shown to you that not only did LMN and Mr. Lummis and their company pick up where PTC left off when PTC went bankrupt, they continued to pattern themselves after the same form of conduct." Hearing Transcript at 26.

The court finds that, although the defendants had notice of the plaintiff's claim of trademark infringement in 1989, the defendants had reason to believe that the plaintiff would not press the matter further. The defendants could reasonably assume that the plaintiff really did not consider itself as aggrieved. The plaintiff, instead of pursuing the defendants' use of the allegedly infringing marks, chose to track the increase in defendants' business instead. Therefore, the defendants have had seven years to plan their business on the assumption they may use the mark. *See Landers, Frary & Clark v. Universal Cooler Corp.*, 85 F.2d 46, 49 (2nd Cir.1936) ("When for eight years one plan one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be").

In consideration of the foregoing, the court finding that the defendant's motion for summary judgment on Counts XIII, XIV, XV, XVI and XVII of the Amended Complaint is due to be granted, the court hereby **GRANTS** said motion on these counts. The plaintiff's cross motion for partial summary judgment in these counts be and hereby is **DENIED**.

### B. Infringement/Unfair Competition

In order to prevail on their infringement claims, the plaintiff must show: (1) its trademark or trade dress is primarily non-functional; (2) the trademark or trade dress is confusingly similar; and (3) the trade dress is inherently distinctive or has acquired secondary meaning. *Epic Metals v. Souliere*, 99 F.3d 1034, 1038 (11th Cir.1996); citing *Brooks Shoe*

16

*Manufacturing Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857 (11th Cir. 1983).  *See also*

*Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir.

1999).

A "functional" feature had been defined by the United States Supreme Court as one

that "is essential to the use or purpose of the article or one that affects the cost or quality of

the article."  *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 850, n.10, 102 S.Ct. 2182,

2186, n.10, 72 L.Ed.2d 606 (1982).  The Court has also stated that a design is legally

functional and thus unprotectable if it is one of a limited number of equally efficient options

available to competitors and free competition would be unduly hindered by according the

design trademark protection.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775, 112

S.Ct 2753, 2760, 120 L.Ed.2d 615 (1992).

Under the Lanham Act, the use of a registered mark in connection with the sale of

goods when such use is likely to cause confusion, create mistake or deceive, is prohibited.

15 U.S.C. § 1114.  To prevail on its trademark infringement claim, the plaintiff must

establish that (1) its mark has priority and (2) the defendant's mark is likely to cause

confusion.  *Carnival Brand Seafood v. Carnival Brands*, 187 F.3d 1307, 1309 (11th

Cir.1999).

Trade dress is protected under 15 U.S.C. § 1125(a), which states that anyone who uses

a false description of origin, including words or other symbols tending to falsely describe or

represent goods or services and causes the same to enter commerce, shall be liable in a civil

action by anyone who believes he is injured by the use of such false description or representation. The design of a product – its configuration – may constitute protectable trade dress under 15 U.S.C. § 1125(a). *Epic Metals*, 99 F.3d at 1038.

To determine the likelihood of confusion, the Eleventh Circuit uses a seven factor test: (1) the type of mark; (2) the similarity of the marks; (3) the similarity of the goods; (4) the identity of customers; (5) similarity of advertising; (6) the good or bad intent of defendant and (7) evidence of actual confusion. *Carnival*, 187 F.3d at 1311-1312, citing *Tally-Ho, Inc. v. Coast Community College*, 889 F.2d 1018, 1027 (11th Cir.1989). In *Conagra*, the court described the sixth and seventh elements as "(6) defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's establish mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion. *Conagra*, 743 F.2d at 1514.

The Supreme Court stated that if trade dress for which protection is claimed under § 43(a) is inherently distinctive, "it is capable of identifying products or services as coming from a specific source and secondary meaning is not required. This is the rule generally applicable to trademarks, and the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two (citations omitted)." *Two Pesos*, 505 U.S. at 772-774, 112 S.Ct. at 2753-2760.

18

The plaintiff alleges that its marks are well known and popular with the consuming public, thus deserving of wide protection. Plaintiff's memo. at 11. However, the court finds scant evidence of the familiarity of the consuming public with any of plaintiff's marks. Plaintiff's evidence establishes only that the defendants are familiar with the plaintiff's lures.[12]  Plaintiff's exhibits 31 and 32. While the court agrees with the plaintiff that the names of the lures in question are fanciful, and thus deserve wide protection, the court again notes the lack of evidence that the consuming public knows the names of the lures they purchase. The plaintiff's expert states in affidavit that:

> PRADCO sells its lures under various brand names, including "Heddon" (Spook and Torpedo), "Rebel" (Deep Wee Craw), "Smithwick (Devil's Horse), "Arbogast" (Hula Popper and Jitterbug), "Cordell" (Th'Spot), "Bomber", "Excalibur" (Spook and Super Spook). Therefore, the appearance of PRADCO's famous lures and recognizable shapes on another package would not prevent confusion.

Ellison Affidavit at 12.

The court finds that some of the defendants' lures in question are almost exact replicas of the plaintiff's. The plaintiff argues that the packaging the lures come in cannot alleviate the confusion caused by the replication of the lures themselves. The court notes the packaging looks nothing alike and is not claimed to be a copy of any of the plaintiff's

---

[12]Because plaintiff actually manufactures six separate brands of fishing lures, apparently none of which in any way identify themselves on the packaging or lure as owned by plaintiff, the plaintiff must show that either each of its brands or the lures associated with them, or some combination thereof, are well known by the consuming public, namely fishermen. The plaintiff has presented no evidence that fishermen know, for example, that the Zara Spook lure is produced by Heddon. Nor has the plaintiff produced any evidence that the consuming public knows that PRADCO owns all six brand names and/or that EBSCO owns PRADCO.

packages. The defendant sells its lures in a blue package with a drawing of Boomer Wells printed on the front and a story of Boomer Wells printed on the back. Uncontested fact number 24. This court cannot overlook the fact that all of the evidence presented in this case is that both parties' lures are sold in packaging. Therefore, while the court finds that some of the lures are quite similar, the court also finds that any possible confusion caused by such similarities is lessened by the packaging differences. No evidence is before this court that fishermen ignore packaging.[13] Furthermore, plaintiff's representative, Mr. Hall, testified that the packaging itself is not confusingly similar. Depo. of Hall at 186-187.

The plaintiff's expert's affidavit states that "[l]ure shapes are important to the fisherman because when he recognizes the lure as one he has fished before with some success, he is more likely to buy another in later purchases. When he sees a lure that has substantially the same shape he generally will buy that lure based on the shape." Affidavit of Ellison at 10. However, the defendants submit evidence that fishermen do not ask for lures based on shape. Declaration of Brawley at 4. No evidence that fishermen disregard the packaging of the lures has been submitted. Defendants' expert states that he knows of no lures sold to consumers outside their packaging. Cordell report at ¶ 25; see also Declaration of Gartland at 2.

---

[13]James Gowing made the point that regardless of the design of a lure which may get fish to bite it, the first step is to get a fisherman to buy the lure. Gowing testified "Well, first of all let me say this, a fish ain't got no money. Okay. Fish don't – they don't have money .... First, you've got to get somebody to buy it and use it ...." Depo. of Gowing at 39, submitted at defendants' appendix exhibit 7.

20

The declaration of Mel Carter, submitted by defendants, states that "[i]t is my experience that there are many lures sold by many different companies that are very similar in their general shape. It is my experience that, despite the similarity in shape of these lures, that consumer confusion is minimized or eliminated by the distinctive packaging and displays utilized by lure companies. The packages for 'The Producers' fishing lures are distinctively different from other manufacturers, and are very different from the packages used by PRADCO." Declaration of Carter at 1-2, submitted as defendants' opposition exhibit 21.

Any possibility of confusion is further lessened by the defendants' use of a dump bin for their lures. *See* defendants' opposition exhibit 25. *See* Declaration of Clapp at 3 ("This type of display [the lure riot] is unlike any other lure company's display that I have encountered"); declaration of Kreg Brawley at 2, submitted as defendants' opposition exhibit 23, declaration of Gartland at 3. The defendants allege under oath that they have never received any communication from a customer or potential customer who believed that any of the lures at issue here were manufactured, sold, or licensed by the plaintiff, nor have they received any communication from a customer or potential customer who believed plaintiff's lures were manufactured by defendants. Declaration of M. Lummis at ¶¶ 5-6; declaration of James Clapp at 2, submitted as defendants' opposition exhibit 22.

As to the names assigned the lures, the court does find that Jitterbug and Chug-A-Lug rhyme, that Hula Popper and Hawg Stopper rhyme and that Spook and Mega Spook are

21

synonyms of Ghost and Mega Ghost.[14] This court has more trouble with plaintiff's claimed "phonetic imitation" of Torpedo and Turbo.[15] Plaintiff's memo. at 12.

The goods are similar in that they are all lures and the court has previously noted that the defendants' business is based in part on copying more expensive lures such as the plaintiff's. Furthermore, the customers would be identical, as both parties presumably market exclusively to fishermen. Both parties distribute their lures through sporting good distributors and sporting good retailers. Uncontested fact numbers 22 and 23. Scant evidence of where the lures are marketed has been submitted, however, thus the court can only guess that the lures are sold in the same states, let alone the same stores. While the plaintiff argues otherwise, the evidence in this case is that the defendant does little to no advertising. Therefore, the court finds no similarity of advertising. While the court does find the defendant has copied the plaintiff's lure designs, the court finds that the defendant has not attempted to pass off defendants' lures for plaintiff's, but rather sells them as a cheap copy of plaintiff's. As such, this court finds that the defendants are not seeking a competitive advantage from associating their mark with any of the plaintiff's, but rather seeking to compete by selling cheap imitations of plaintiff's as cheap imitations. Similarly, no evidence

---

[14]The plaintiff's complaint only addresses the names of the lures for trademark infringement purposes for the Jitterbug (Count IV) and the Torpedo (Count XXVII).

[15]The court notes that "Torpedo" conjures up an image of a shape which actually resembles the lure, while "Turbo" seems more to imply that the lure would move quickly, as in "turbo-charged." This court finds little similarity between these two names beyond the obvious alliteration.

of actual confusion by consumers has been presented by the plaintiff.[16]   Plaintiff's

representative testified that he is "not aware of any actual causes of confusion" and that he

is "not aware of any specific cases where a customer is confused." Depo. of Hall at 172-173.

Plaintiff's expert, Dave Ellison, testified that he has not heard of anyone who has been

confused between the plaintiff's and the defendants' lures. Depo. of Ellison at 79 (submitted

as defendant appendix exhibit 12). He conducted no surveys. Depo. of Ellison at 64-65, 94,

submitted as exhibit 6 to defendants' appendix of exhibits in opposition to plaintiff's motion

for summary judgment ("defendants' opposition exhibit ___") (doc. 60). Further, Thomas

Middleton stated that he knows of no case where the plaintiff has attempted to survey

customers concerning the PRADCO lures in comparison to LMN lures. Middleton depo. at

151, submitted as defendants' exhibit 32.

James Carp, a sales representative with a company which markets fishing products,

including those of defendants, states by declaration that he has never been told, nor been

made otherwise aware, of any consumer confusion between any of LMN's lures and

PRADCO's lures. Declaration of Clapp at 2; declaration of Kreg Brawley at 2, submitted

as defendants' opposition exhibit 23; declaration of William Gartland, submitted as

defendants' opposition exhibit at 24. Mr. Carter stated he was never confused as to the

source of any of PRADCO's of LMN's lures, as the lures are sold in packages clearly

---

[16]The only consumer evidence submitted by plaintiff was in the form of conversations
plaintiff's expert had overheard in tackle shops and the like. By separate order, the court has
ruled such testimony is hearsay and inadmissible. Therefore, no evidence of consumer confusion
is before this court.

identifying their source. He has never been told, nor been made otherwise aware of any

consumer confusion between any of plaintiff's and defendants' lures. Declaration of Carter

at 2.

Ellison further testified that the "Blurp" lure, made by a nonparty to this suit, could

be confusingly similar with the plaintiff's Heddon Torpedo, but then stated:

> But if you take everything in context. You know, if I –It's difficult to say just
> on its own, but if you saw the packaging and everything, it could be then ....
> Just the way everything is done in presenting the particular lure. Because, you
> know, it if it's – For example, let's say that this lure was displayed in K-Mart
> right beside a Torpedo of PRADCO, that's part of the context. If the
> packaging – I mean, the packaging, I don't know what it says, if it says:
> manufactured by Kendik, and it refers to something else, that might lead
> someone to believe.
>
> See, you have to look at the whole context of things, I think, in addition to the
> shape. There is a lot more to it than just shape, although shape is obviously
> very important.

Depo. of Ellison at 120-121. He further testified that he assumed the defendants' lures were

displayed on pegs, but had never seen them displayed. Depo. of Ellison at 122.

### Spook/Ghost lures

The plaintiff claims that it has the exclusive right to use the shape or configuration of

its Spook lure. *See* Count XVIII, XX (configuration trademark infringement claim), Count

XIX (word and configuration unfair competition claim), and Count XXI (configuration

common law trademark infringement claim), plaintiff's Amended Complaint.

24

The court finds from the evidence submitted that a shape seemingly identical to the plaintiff's "Spook" configuration is manufactured not only by the plaintiff and defendants, but the following companies as well: Norman Lures ("Rat Lure"), Bagley ("Tall Walker"), Otee ("the Buttoneye Minnow Top-Water Walker"), Worden's ("Spook"), Mann's ("Jackpot"), and Phillips Lures ("Ugly Albert"). Defendants' opposition exhibit 12, Cordell rebuttal report at 2. *See also* plaintiff's exhibit in support 25. As such, this court finds the plaintiff's claim of exclusive right to use to be dubious. Mr. Carter stated that "fishermen are aware that many different fishing lure companies manufacture lures that have similarities in shape, size, color, and general characteristics. For this reason, fishermen attach even more significance to a particular brand name, packaging style, or display." Declaration of Carter at 2. Furthermore, at oral argument, the plaintiff stated:

> Well, their packaging may be different, that doesn't mean that the purchasing public will not recognize that the lures on there are on the same lures and they can look and see an Excalibur Spook and they can look and see a Heddon Spook and they can look and see a Producers Ghost, and it's the same lure in all three packages. And they have the right to assume that those lures all come from the same place because all three of the packaging have on there the words Fort Smith.

Transcript at 37-38. *See also* expert report of Ellison at 4, submitted as defendant opposition exhibit 18 ("This lure configuration is also one of the more famous lures in lure history, and is commonly associated with the retrieve maneuver called "walking the dog"). Defendants'

expert states that this lure has a generic shape which fishermen would not associate with any one particular manufacturer.[17]   Cordell rebuttal report at 3.

The court finds that any confusion which may result from the defendants' use of their Ghost design is no greater than the confusion which may result from at least seven other lure manufactures also making a similar lure.  Given the number of other companies using the same design, and the fact that these other companies advertise in trade journals as does the plaintiff, this court cannot find that confusion results from the defendants' use of this design.[18]  Furthermore, the court notes a paucity of actual confusion has resulted from the plaintiff, defendants, and at least seven other lure manufactures using this same configuration.  Evidence was submitted that fishermen are discerning customers who exercise a high degree of care to make sure what they are buying is what they want, and they do this by paying close attention to brand names, packaging and displays.  Declaration of Clapp at 3, declaration of Gartland at 3.

The plaintiff's expert points out that manufacturers of lures license their lures for sale under private labels by third parties.  Mr. Ellison concludes that this would increase the likelihood that fishermen seeing PRADCO shapes in LMN packages would assume that the

---

[17]Cordell points out that fishermen have been making this generic lure shape for years by cutting a section of broom handle, tapering the ends, and attaching hooks.  Cordell rebuttal report at 3.

[18]Apparently, lure copying is fairly common in the lure business.  Defendants submit declarations of two lure sales representatives who state such is the case and that plaintiff also copies other manufacturers' lures.  These individuals allege that the PRADCO Rebel Minnow is a copy of a Rapala lure and the PRADCO Rebel Shad-R is a copy of Rapala's Shad-Rap lure. See declarations of Brawley at 2 and Clapp at 3.

26

packaging and sale was authorized by PRADCO. Ellison affidavit at 13. However, the plaintiff has failed to produce evidence that fishermen know the lures in question are even produced by PRADCO. For example, nowhere on the Heddon packaging or advertising does the word "PRADCO" appear. Defendants' opposition exhibit 35; plaintiff's exhibit in support 26. The same is true for Arbogast, Rebel and Cotton Cordell advertisements. Plaintiff's exhibit in support 26. This, combined with the fact that plaintiff sells identical lures with identical names under multiple brand names, is as likely to be confusing to fishermen as the defendants marketing similar lures under different names in different packaging. This court is unable to conclude that the defendants' actions are more likely to cause consumer confusion than the plaintiff's own actions.

However, because this court must consider the evidence in the light most favorable to the non-moving party, which in this posture is the plaintiff, and because this court finds that a reasonable jury could find that a likelihood of confusion exists, the court finds that genuine issues of material fact remain and therefore **DENIES** the defendants' motion for summary judgment on Counts XVIII, XIX, XX and XXI of the Amended Complaint and also **DENIES** the plaintiff's cross motion for partial summary judgment.

### Spine design, Devil's Horse configuration and Th Spot configuration

This court, having reviewed all of the evidence submitted by both parties, finds scant evidence was submitted on the counts of the amended complaint concerning the plaintiff's Spine design, Devil's Horse configuration, and Th Spot configuration. Because this court

finds a lack of evidence of actual confusion and a lack of evidence of likelihood of confusion, this court finds that the plaintiff has failed to establish this essential element of its trademark infringement claim with regard to each of the counts of the Amended Complaint which concern these particular lures and design. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. Thus, this court must agree with the defendants that the plaintiff has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *Celotex Corp.,* 47 U.S. 322-23.

The court finding scant evidence of trademark infringement for the Spine design was presented by the plaintiff, the defendants' motion for summary judgment on Count XXXIV of the Amended Complaint be and hereby is **GRANTED**. The court finding no evidence of trademark infringement, unfair competition or dilution for the Devil's Horse configuration was presented by the plaintiff, the defendants' motion for summary judgment on Counts XXIX, XXX, and XXXa of the Amended Complaint be and hereby is **GRANTED**.[19] The

---

[19]Beyond the allegations of the plaintiff's complaint, the only evidence about this lure the Court can find is as follows: A reference that this lure is "very similar to the defendant's Double Ender lure" (Hall depo. at 213) and a statement that the Double Ender is a look-alike of the Devil's Horse lure (Ellison affidavit at 10, 12). These statements fall far short of the evidence plaintiff would need to establish a likelihood of prevailing at trial. The same is true of the Th' Spot lure. The defendant presented evidence that these sets of plaintiff's and defendants' lures do not look alike. Cordell report at ¶¶ 21-22. Further, the defendants presented unrebutted evidence that the Devil's Horse configuration is also produced by at least five other lure manufacturers. Cordell rebuttal report at 4. The defendants also present unrebutted evidence that the plaintiff has not sold the Th' Spot lure in many years, and that over 70 other lure manufacturers produce a similar looking lure. *Id.*

28

court finding no evidence of trademark infringement, unfair competition or dilution for the Th Spot configuration was presented by the plaintiff, the defendants' motion for summary judgment on Counts XXXI, XXXII and XXXIII of the Amended Complaint be and hereby is **GRANTED**.[20]

**The Jitterbug/Chug-A-Lug lures**
**The Hula Popper/Hawg Stopper lures**

The defendants allege that they were first contacted by Arbogast, one of plaintiff's predecessors, in 1988 concerning their Chug-A-Lug and Hawg Stopper lures. Declaration of M. Lummis at ¶ 7. Arbogast at that time alleged the defendants' lures were infringing their configuration trademark rights in the Jitterbug and Hula Popper lures. *Id.* The defendants and Arbogast entered a settlement agreement concerning these lures, wherein the defendant agreed to make specific modifications to their lures. These changes were made and the defendants have not again changed their design since that time. *Id* at ¶ 7. Mr. Lummis states he was unaware of the plaintiff having trademark rights in these two configurations before 1988. *Id.* at ¶ 8.

The defendants' expert stated in his report that the lure sold by plaintiff under the trade name Hula Popper is not the same lure which is shown in Trademark Registration 1,508,373. He states that the differences include the number of hook hangers, the type of hook hanger, the mouths, and the shape of the body. He therefore concludes that the Hula

---

[20]*See* discussion of dilution, *infra.*

29

Popper is not the same lure as the one depicted in Trademark Registration 1,508,373. Cordell report at ¶ 11. Mr. Cordell opines that the defendants' lure Hawg Stopper is not confusingly similar to the plaintiff's trademark registration depiction or the Hula Popper lure. Cordell report at ¶ 14, 18. Mr. Cordell further states that the Hula Popper's distinctive feature is its "v" shaped head. Cordell rebuttal report at 2. A quick glance at the lures demonstrates that the defendants have not copied the plaintiff's lure's head shape. *See* defendants' appendix exhibit 28, plaintiff's exhibit 8. Furthermore, the plaintiff's representative states in deposition that he does not consider these two lures to be "that confusingly similar" other than in name. Depo. of Hall at 66, submitted as defendants' opposition exhibit 30.

However, because the court finds that enough evidence has been submitted to create a genuine issue of material fact on the issue of likelihood of confusion, the court **DENIES** the defendants' motion for summary judgment on Counts VIII, IX and X of the Amended Complaint and further **DENIES** the plaintiff's cross motion for partial summary judgment on this issue.

In Mr. Cordell's opinion, the defendants' configuration of its Chug- a-Lug lure is not confusingly similar to the lure depicted in Trademark Registration 1,508,372, which is what the plaintiff markets as its Jitterbug lure. Cordell report at ¶ 13, 17. Cordell also stated that the plaintiff's Jitterbug lure is sold with several different body shapes and that this shape is common place in the lure industry. Cordell rebuttal report at 2, submitted as defendants'

opposition exhibit 26; defendants' opposition exhibit 4.  He states that the Jitterbug's distinctive feature is the front lip having smoothly curved edges.  *Id.*

However, because the court finds that enough evidence has been submitted to create a genuine issue of material fact on the issue of likelihood of confusion, the court **DENIES** the defendants' motion for summary judgment on Counts I, II, III, IV, and VII of the Amended Complaint and further **DENIES** the plaintiff's cross motion for partial summary judgment on this issue of the plaintiff's Amended Complaint.

### Turbo/Torpedo

The court finds from a review of the evidence that the same arguments are made with regard to this pair of lures as were made regarding the Jitterbug/Chug-A-Lug lures and the Hula Popper/Hawg Stopper.  For the same reasons as set forth *supra,* the court finds that genuine issues of material fact remain on the issue of likelihood of confusion and thus **DENIES** the defendants' motion for summary judgment on Counts XXV, XXVIII and XXVIIIa of the plaintiff's Amended Complaint and further **DENIES** the plaintiff's cross motion for partial summary judgment on this issue.

### Functionality

The defendant argues that the plaintiff is not entitled to trademark protection for its lure configurations because such configurations are functional.  Even if the plaintiff's trademark registration has achieved incontestable status under 15 U.S.C. § 1065, it is still subject to attack based on functionality.  177 F.3d 1204, 1211-1212.  The court finds that a

31

genuine issue of material fact remains on the issue of functionality and therefore should be left for the jury to decide.

### Dilution Under 15 U.S.C. § 1125(c)[21]

In examining the type of marks at issue here, this court has used the five prong test for dilution of a trademark drawn from 15 U.S.C. § 1125(c) and recently restated by the Second Circuit: (1) the senior mark must be famous; (2) the senior mark must be distinctive; (3) the junior use must be a commercial use in commerce; (4) the junior use must begin after the senior mark has become famous and (5) the junior mark must cause dilution of the senior mark.[22] *Nabisco v. PF Brands, Inc.,* 191 F.3d 208, 215 (2nd Cir.1999). *See also Carnival Corp. v. Seaescape Casino Cruises,* -- F.Supp. –, 1999 WL 1023121, at 7 (S.D.Fla.) ("To prove a dilution claim, a plaintiff must provide sufficient evidence that 1) its mark is famous; 2) the defendant adopted its mark after the plaintiff's mark became famous; 3) the defendant's mark diluted the plaintiff's mark; and 4) the defendant's use is commercial and in commerce"); citing *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633 (7th Cir.

---

[21]While the defendants argue that the Federal Trademark Dilution Act of 1995 (15 U.S.C. § 1127) should not be applies retrospectively to them, this court finds that the plaintiff has not plead in its Amended Complaint that such Act applies.  This court finds the only dilution allegations made by plaintiff are brought under 15 U.S.C. § 1125(c).

[22]As the Eleventh Circuit explained in *Tally-Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018 (11th Cir.1989), an infringement action is based on the likelihood of consumer confusion between suppliers of competing goods in the same geographic area. *Id.* at 1024. A dilution action, in contrast, is based on the concept that a strong trademark has value beyond its ability to distinguish a good or service's source. *Id.* A dilution action protects the owners of such strong, distinctive marks from the diminution of consumer goodwill by competitors or non-competitors. *Id."  Carnival Corp. v. Seaescape Casino Cruises* 1999 WL 1023121, at 7 (S.D.Fla.).  The plaintiff here makes both types of claims.

Sept. 13, 1999); *Avery Dennison Corp. v. Sumpton*, 1999 WL 635767 (9th Cir. Aug. 23,

1999); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,*

170 F.3d 449, 452 (4th Cir.1999), *cert. denied*, 1999 WL 412763 (U.S. Oct.4, 1999).

The *Nabisco* court defined "distinctive" as an element of dilution as follows:

> At the low end are generic words – words that name the species or object to which the mark applies. These are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name (citations omitted). Thus no one can claim the exclusive right to use the mark "CAR" for a car. One rung up the ladder are "descriptive" marks – those that describe the product or its attributes or claims. These also have little distinctiveness and accordingly are ineligible for protection unless they have acquired "secondary meaning" – that is, unless the consuming public has come to associate the mark with the products or services of its user (citation omitted). The next higher rung belongs to "suggestive" marks: these fall in an in between category.... They do not name or describe the product for which they are used, but they suggest qualities or claims of that product. They are more distinctive than descriptive marks, and thus are accorded trademark rights without need to demonstrate that consumers have come to associate them with the user of the mark.... Nonetheless, because they seek to suggest qualities of the product, they possess a low level of distinctiveness. They are given less protection than is reserved for more distinctive marks – those that are "arbitrary" or "fanciful." A mark is arbitrary or fanciful if there is no logical relationship whatsoever between the mark and the product on which it is used....

*Nabisc*o, 191 F.3d at 215-216.

This court finds from an examination of the evidence that the names the plaintiff has

given its lures are fanciful. However, this court has trouble finding any evidence to support

a finding that its marks have "come to be uniquely associated with a specific source. *Two*

*Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. 2753. The plaintiff must show that in the minds of the

public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself. *Inwood Labs v. Ives Lab.*, 456 U.S.844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The plaintiff's expert states in his report that the shapes of the plaintiff's lures are recognizable to fishermen." Ellison report at 3-4. No evidence supports a finding by this court that such shapes are associated with the plaintiff as the manufacturer of such shapes by fishermen. However, due to the plaintiff's length of use of these marks, extent of advertising, sales volume and others' efforts to copy this court finds that genuine issues of material fact remain on this issue. *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291-94 (7th Cir.1998). *See also Audia Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960).

Further, this court finds a genuine issue of material fact remains as to whether the plaintiff's configurations are distinctive, as the defendant has produced evidence that a variety of lure manufacturers sell similar designs to the ones at issue here. Because this court finds a genuine issue exists as to the distinctiveness of the lures, the court finds that a genuine issue must exist as to the question of dilution.

Further, the court finds that the evidence creates a genuine issue of material fact on the question of dilution of the plaintiff's word and configuration trademarks. As such, this court **DENIES** the defendants' motion for summary judgment on counts V, XI, XVI, XXII, XXIII and XXVI of the plaintiff's Amended Complaint. As this court finds that the

34

plaintiff's burden of proof for dilution under §8-12-17, Alabama Code 1975, is essentially the same as under federal law, the court finds that the same analysis applies to those counts of the amended complaint brought under state law. For the reasons set forth above, the court finds further that a genuine issue of material fact remains on the issue of dilution. As such, this court **DENIES** defendants' motion for summary judgment on Counts VI, XII, XVII, XXIV and XXVII of the Amended Complaint.

### Count XXXV: False Advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1114(1)

The plaintiff alleges that defendants' use of the Boomer Wells character constitutes false advertising in that it makes the representations that Boomer Wells is a professional fisherman, that he personally designed the lures in question and that he has participated in and won certain fishing tournaments. Depo. of James Hall, at 11-12, submitted at defendant appendix exhibit 15. Hall, the plaintiff's representative, stated he knew this was false the first time he saw a lure manufactured by the defendants, which was about six years earlier. Depo. of Hall at 13-14. However, he made no effort to identify who Boomer Wells was or whether such an individual even existed. *Id.* at 14. Mr. Hall has never heard anyone say he or she believed Boomer Wells was a real person. *Id.* at 16-17. He also could not state what sales PRADCO had lost because of the alleged false advertising of defendant. *Id.* at 17.

The plaintiff alleges that the defendants' use of a made-up story about Boomer Wells on the back of their packages, constitutes false advertising. Hall testified that the statement

35

on the package back that Boomer Wells "recently placed an overwhelming first in the 18[th]

Biannual Fort Smith Rod Club's International Golden Masters Invitational Classic Open

Bass Tournament in Eufaula, Minnesota" suggests a connection with PRADCO. Depo. of

Hall at 192. The plaintiff basis this claim on PRADCO's location being in Fort Smith,

Arkansas. Depo. of Hall at 193. However, Mr. Hall also testified that "I guess with my

knowledge of fishing, I would think it was probably a joke." Depo. of Hall at 194. He has

not heard anyone say the back of the defendants' packaging led them to believe the two

companies were connected. Depo. of Hall at 194. The court notes that the packaging story

also states that Boomer Wells won a thirty day trip to Finland and a thirty day trip to "the

slammer" compliments of Game Warden "Tater" P. Slater. Plaintiff's exhibit in support 53.

The defendants' expert stated that the story on the back of defendants' packaging is

"clearly intended as a humorous tale. It is my opinion that no consumer could reasonably

be misled into believing that the funny story on the LMN packaging is a true story." Cordell

report at ¶ 28. The story has been used on the back of defendants' packaging since at least

1987. M. Lummis declaration at ¶ 3. Mr. Lummis states that, in his experience, customers,

suppliers, sales representatives and buyers are aware of this story on the back of the

packaging and identify the same with the defendants. He states that the defendant has never

received any indication from the consuming public that anyone has been deceived by this

story. Declaration of M. Lummis at ¶¶ 4-5. Mr. Carter stated that no customer ever

expressed to him, nor is he otherwise aware of any consumer who read the Boomer Wells

story on the back of defendants' packaging and was thus led to believe there was some association between "The Producers" and PRADCO. Declaration of Carter at 2. *See also* declaration of Clapp at 2, declaration of Gartland at 3. Mr. Brawley stated by declaration that he has been told by purchasers of defendants' lures that they either love the funny stories about Boomer Wells, or wish the defendants' brand would be more serious. Either way, he understood his customers to be aware that the stories were meant to be "tongue-in-cheek" Declaration of Brawley at 2.

Furthermore, plaintiff's own expert stated that "I do not believe the packaging of the lures to be significant in the purchasing decisions of fishermen..." Affidavit of Ellison at 12. The plaintiff has thus argued to this court that the use of "Fort Smith" on the back of the defendants' packaging is likely to cause confusion and amounts to false advertising for purposes of this claim and the same time arguing that fishermen will ignore the packaging in making lure selections because the shape of the lure is much more important to the fishermen for its trademark infringement claims. Hence, the plaintiff is asking this court to rule that fishermen ignore the packaging when purchasing lures on its infringement claims but may be deceived into believing they are purchasing the plaintiff's lures based on that very packaging on its false advertising claims. The plaintiff has presented no evidence that consumers are deceived by the use of "Fort Smith"on the defendants' packaging. The plaintiff has presented evidence that the packaging is immaterial. Affidavit of Ellison at 12.

Thus, this court has no choice but to grant the defendants' motion for summary judgment on the plaintiff's false advertising claim as the plaintiff has presented no evidence of deception and even argued against anyone being deceived by it as plaintiff's own expert's statement is that fishermen do not consider the packaging when buying lures.

In consideration of the foregoing, summary judgment is hereby **GRANTED** in favor of the defendants and against the plaintiff on Count XXXV of plaintiff's Amended Complaint.

### Count XXXVI: False Advertising under Alabama Code § 8-19-5

The plaintiff alleges that the defendants' use of Boomer Wells in its promotion of lures violates the Alabama Deceptive Trade Practices Act, specifically § 8-19-5 (5), Ala.Code, as amended 1999.  This court finds as a matter of law that the plaintiff lacks standing to bring this claim. Under § 8-19-3(2), Ala.Code., a "consumer" is defined as "any natural person who buys goods or services for personal, family or household use." Liability under the chapter is imposed against "[a]ny person which commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer..." § 8-19-10, Ala.Code. *See also Deerman v. Federal Home Loan Mortgage Corp.*, 955 F.Supp. 1393, 1399 (N.D.Ala.1997).

In consideration of the foregoing, the court finds that the defendants' motion for summary judgment on Count XXXVI is due to be granted and hereby **GRANTS** the same.

38

## IV. CONCLUSION

In consideration of the foregoing, the court **ORDERS** that the defendants' motion for summary judgment on the following counts of the plaintiff's Amended Complaint be and hereby is **GRANTED:** XIII, XIV, XV, XVI, XVII, XXIX, XXX, XXXa, XXXI, XXXII, XXXIII, XXXIV, XXXV and XXXVI.

It is further **ORDERED** by the court that the remainder of the defendants' motion for summary judgment be and hereby is **DENIED.** The plaintiff's cross-motion for partial summary judgment be and hereby is **DENIED.**

**DONE** and **ORDERED** this the _25_ day of February, 2000.


_____
UNITED STATES DISTRICT JUDGE
INGE P. JOHNSON